UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:01-cr-269-T-23AAS
8:13-cv-1701-T-23AAS

RUSSELL JOHN NESTOR
_________________________________/

# ORDER

On March 17, 2001, twenty-three-year-old Paul Kniep ingested a fatal dose of gamma-butyrolactone (GBL). Convicted of distributing the GBL that resulted in Kniep's death, Russell John Nestor moves (Doc. 1) under 28 U.S.C. § 2255 to vacate his sentence and alleges ineffective assistance of trial counsel.

## Background

A month before Paul Kniep died, Tampa police began surveilling Nestor's house based on a report that Nestor was involved in another GBL overdose. (Doc. 158 at 33–36) Nestor lived with a married couple, Detta and Patrick Spence, and a third roommate, Danny Golden. Golden was Paul Kniep's childhood friend, and Golden introduced Kniep to Nestor and to GBL.[1] (Doc. 159 at 85) During three weeks of surveillance, police at least four or five times saw Kniep's red 1967 Pontiac LeMans parked outside Nestor's house. (Doc. 158 at 37–38)

[1] GBL is an industrial solvent that immediately converts to gamma-hydroxybutyric acid (GHB) when ingested. GHB is commonly known as a "date rape drug" because a low dose induces euphoria and a sufficiently high dose is incapacitating.

At 7:29 a.m. on March 17, 2001, Patrick Spence called 911 to report that Kniep "pulled up overnight and is dead in my driveway." (Doc. 158 at 90, 155, 212; Pre-Sentence Report at ¶ 27) Although Kniep was found sitting in the driver's seat of his LeMans, his lividity suggested that he died lying down. (Doc. 158 at 165–166) The Spences later admitted that Kniep died inside the house and claimed that Nestor insisted on moving the body. (Doc. 158 at 209; Pre-Sentence Report at ¶ 19)

Police seized 9.8 gallons of concentrated GBL from Patrick Spence's van. From Nestor's bedroom, police seized videos that appeared to show Nestor's intoxicated female customers suffering sexual assault. (Doc. 159 at 109–111; Doc. 161 at 220–221; Pre-Sentence Report at ¶ 17)

The Spences pleaded guilty to making their house available to Nestor for storing, distributing, and using GBL. (8:01-cr-270-1 and 8:01-cr-270-2) Nestor went to trial for conspiring to distribute and to possess with intent to distribute GBL, a controlled substance analogue to GHB (count I); distributing GBL that resulted in the death of Paul Kniep (count II); possessing 9.8 gallons of GBL with the intent to distribute (count III); and distributing GBL with the intent to commit sexual assault (count IV). Answering a special interrogatory, the jury found that GBL is a controlled substance analogue of GHB, and the jury convicted Nestor of the offenses in counts I, II, and III. (Doc. 95)

Nestor was sentenced to 360 months' imprisonment on counts I and III, a concurrent 420 months' imprisonment on count II, and five years of supervised

release. The Eleventh Circuit affirmed (Doc. 172), and the Supreme Court denied *certiorari* on May 3, 2004. (Doc. 180)

On July 1, 2013, Nestor moved (Doc. 1) to vacate his sentence. A March 31, 2017 order (Doc. 12) confirms Nestor's entitlement to equitable tolling based on attorney abandonment but defers ruling on the motion's timeliness. Because the motion is denied on the merits, a determination on the knotty issue of timeliness is forborn.

**Ineffective assistance**

To demonstrate that counsel was constitutionally ineffective, a movant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced the movant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

**1. Failure to negotiate a plea agreement**

In ground one, Nestor argues that counsel failed to negotiate a plea agreement or substantial assistance motion. The United States represents (Doc. 6 at 13) that "the government stood on the strength of its evidence, particularly the videos, and was not inclined to extend a plea offer."

"[A] defendant has no right to be offered a plea, nor a federal right that the judge accept it." *Missouri v. Frye*, 566 U.S. 134, 148 (2012) (internal citation omitted).

Nestor alleges no "reasonably specific, non-conclusory fact" to suggest that the United States was willing to negotiate a plea agreement or to file a substantial assistance motion. *Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (internal quotation marks omitted). Indeed, Nestor concedes that counsel told him that the United States "was not inclined to make an offer." (Doc. 9-3 at ¶ 3) Counsel is not deficient for failing to pursue unavailable negotiations.[2]

**2. Failure to investigate**

In ground two, Nestor alleges that counsel performed an inadequate pre-trial investigation because during thirteen months of pre-trial incarceration Nestor met with counsel in person only once, he met with a defense investigator twice, he spoke with counsel on the telephone twice, and he received two letters from counsel. (Doc. 9-3 at ¶ 2)

"[T]he brevity of time spent in consultation, without more, does not establish that counsel was ineffective." *Jones v. Estelle*, 622 F.2d 124, 127 (5th Cir. 1980) ("[I]t is not enough to show that counsel only met with [the petitioner] once before trial, as long as counsel was adequately prepared."). Instead, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances,

[2] Even if counsel's performance were constitutionally deficient, Nestor's affidavit conspicuously omits assurances that he would have accepted a plea or rendered substantial assistance. (*See* Doc. 9-3 at ¶ 3); *Rosin v. United States*, 786 F.3d 873, 878 (11th Cir. 2015) (affirming the denial of a § 2255 motion without an evidentiary hearing where the defendant failed to aver that he would have accepted a plea). To the contrary, even at sentencing Nestor denied involvement in Kniep's death, and he received an upward departure for obstruction. (Doc. 165 at 14, 79)

applying a heavy measure of deference to counsel's judgments." *Williams v. Allen*, 598 F.3d 778, 793 (11th Cir. 2010) (internal quotation marks omitted).

Nestor identifies three purported deficiencies in counsel's investigation. First, Nestor alleges (Doc. 1 at 18) that counsel failed to "understand" that eyewitness Ken Osiel was available to testify. However, that allegation is definitively contradicted by Nestor's reply (Doc. 23 at 9), which states that counsel "recognized the importance of [Osiel's] information" and "called in his investigator and video recorded the complete statement of Ken Osiel."

Second, Nestor argues that counsel overlooked Patrick Spence's account of the night Kniep died. But Nestor concedes (Doc. 9-3 at ¶ 8) that Spence's story materialized only after sentencing, and Nestor does not allege that — before trial — he or any other source notified counsel of Spence's account. *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 752 (11th Cir. 2010) ("[I]n evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."); *Lambrix v. Singletary*, 72 F.3d 1500, 1506 (11th Cir. 1996) ("[C]ounsel cannot be held responsible for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence.")

Third, Nestor alleges that if counsel spent more time with him, Nestor "would have helped [counsel] understand" that police reports contradicted Detective Charles Massucci's trial testimony. (Doc. 9-3 at ¶¶ 5–7) But Nestor does not dispute that

counsel obtained the police reports, and Nestor fails to describe what other investigation was reasonably necessary.

Nestor's central challenge lies with counsel's overall trial strategy, including the decision to omit Osiel's and Spence's testimony and to limit Massucci's cross-examination. As explained below, Nestor falls well short of demonstrating that counsel's trial strategy was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S.C. at 690.

**3. Failure to rebut or impeach Detta Spence's testimony**

At trial, Detta Spence was the only witness to describe the events leading up to Paul Kniep's death. Spence testified that after hearing her dogs bark around 3:00 a.m. or 3:30 a.m., she left her bedroom, she saw Kniep sitting in a recliner in Nestor's living room, she heard Kniep ask Nestor for a "cap" of GBL, she saw Nestor pour GBL from a gallon jug into a purple cup, and she saw Kniep take a sip. Spence left the house to buy crack cocaine. When she returned twenty or thirty minutes later, Kniep was watching television with Nestor and wished her goodnight. (Doc. 158 at 202–207)

In grounds three and five, Nestor alleges that counsel performed deficiently (1) by failing to call Ken Osiel and Patrick Spence to rebut Detta Spence's testimony, (2) by failing to impeach Detta Spence with her prior inconsistent statements, and (3) by failing to more closely cross-examine the government's expert witnesses to undermine Detta Spence's timeline. Nestor maintains (Doc. 1 at 17) that counsel

instead relied on the "woefully ineffective" defense that GBL is not a controlled substance analogue of GHB.

"There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (internal quotation marks omitted). Counsel's reliance on a particular defense is "a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000). "In order to show that an attorney's strategic choice was unreasonable, a petitioner must establish that no competent counsel would have made such a choice." *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998).

Under the Controlled Substance Analogue Enforcement Act of 1986, 21 U.S.C. §§ 802(32)(A) and 813, a chemical compound, such as GBL, is treated as a controlled substance if, among other factors, the chemical structure is "substantially similar" to the chemical structure of a controlled substance, such as GHB. In pre-trial motions, counsel argued that the Analogue Act is unconstitutionally vague as applied to GBL and that the chemical structures of GBL and GHB are not substantially similar. (Docs. 19, 22, 26, 30) At trial, counsel called two expert witnesses who opined that the chemical structure of GBL is not substantially similar to the chemical structure of GHB because the chemicals possess different properties, molecular weights, and structures. (Doc. 162 at 28, 48)

Notably, Nestor does not contend that counsel failed to prepare sufficient evidence to support the analogue defense. *See Fortenberry v. Haley*, 297 F.3d 1213, 1226 (11th Cir. 2002) ("In general, defense counsel renders ineffective assistance when it fails to investigate adequately the sole strategy for a defense *or to prepare evidence to support that defense*.") (emphasis added). Instead, Nestor argues (Doc. 1 at 17) that counsel's reliance on the analogue defense was "incorrect as a matter of law." But Nestor cites no then-governing law or then-known facts to support that argument. *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) ("[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.") (internal quotation marks omitted).

Nestor retained two experienced criminal defense counsel who were commended (Doc. 165 at 87) at sentencing for conducting a "dignified and professional defense." *See Provenzano*, 148 F.3d at 1332 ("Our strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel.") The "substantially similar" inquiry under the Analogue Act presents a factual question for which counsel's strategy could not be "incorrect as a matter of law." *United States v. Brown*, 415 F.3d 1257, 1261 (11th Cir. 2005). And at the time of Nestor's trial, the Analogue Act's constitutionality as applied to GBL was an open question.[3] *See Black v. United States*, 373 F.3d 1140,

[3] Two weeks after Nestor's trial, the Eleventh Circuit rejected the as-applied challenge in *United States v. Fisher*, 289 F.3d 1329 (11th Cir. 2002). However, "[t]actical decisions do not render assistance ineffective merely because in retrospect it is apparent that counsel chose the wrong course." *Willis v. Newsome*, 771 F.2d 1445, 1447 (11th Cir. 1985). Nestor identifies no law or facts to demonstrate that counsel exhibited "a gross misunderstanding of a clear rule of law," *Lawhorn v.*
(continued...)

1144 (11th Cir. 2004) ("If the legal principle at issue is unsettled, however, counsel will not have rendered deficient performance for an error in judgment.")

Counsel's decision to focus on the analogue defense is all the more reasonable because the omitted witness testimony is not exculpatory. According to Ken Osiel, Nestor could not have given Kniep the GBL because Osiel was in Nestor's presence until Kniep fell asleep. (Doc. 9-2 at ¶ 7) According to Patrick Spence, Detta Spence gave Kniep the GBL, but he admits that it was Nestor's GBL. (Doc. 1 at 30) Osiel's and Spence's statements are consistent with Nestor's insistence at sentencing that he "simply did not administer or give" GBL to Kniep. (Doc. 165 at 82)

Nestor overlooks his potential liability for distribution resulting in death under 21 U.S.C. § 841(b)(1)(C) even if he "did not administer or give" GBL directly to Kniep. The statute requires "a cause-in-fact connection between the victim's ingestion of the drugs and death," but the statute "does not require that the defendant's conduct proximately cause the death." *United States v. Webb*, 655 F.3d 1238, 1254–55 (11th Cir. 2011). Nestor is liable for Kniep's death if, as Patrick

---

[3](...continued)
*Allen*, 519 F.3d 1272, 1295 (11th Cir. 2008), or "completely misunderstood" a basic legal concept. *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991) (holding that counsel performed deficiently where counsel "completely misunderstood the purpose" of mitigating evidence); *Young v. Zant*, 677 F.2d 792, 799–800 (11th Cir.1982) (holding that counsel performed deficiently by failing to understand basic procedural rules).

Spence maintains, Nestor supplied Detta Spence with GBL that she gave to Kniep.[4] *Webb*, 655 F.3d at 1250–53 (reviewing § 841(b)(1)(C) cases involving intermediaries).

To the extent Nestor argues that counsel should have called Osiel and Patrick Spence solely to undermine Detta Spence's testimony, Nestor's argument fails because counsel reasonably relied on impeachment. *Chandler*, 218 F.3d at 1319 ("Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."). Counsel cross-examined Detta Spence extensively. (Doc. 159 at 6–64) Counsel challenged Spence's ability to accurately observe Kniep and Nestor because she was not wearing her glasses and was using crack cocaine. (Doc. 159 at 20–22) Counsel elicited evidence of bias when Spence admitted that she testified against Nestor as part of a plea agreement and hoped to receive no jail time. (Doc. 159 at 58–62) And contrary to Nestor's conclusory claim (Doc. 1 at 20), counsel introduced Spence's prior inconsistent statements, including her sworn statements denying that she saw Kniep and Nestor. (Doc. 159 at 28–34, 40–41) *See Card v. Dugger*, 911 F.2d 1494, 1507 (11th Cir. 1990) (holding that counsel's performance was not deficient where the "cross-examination at trial was sufficient to show the weaknesses in the witness's testimony").

---

[4] The United States introduced evidence that Nestor distributed GBL to Detta and Patrick Spence (Doc. 158 at 181–182), to Danny Golden and Paul Kniep (Doc. 159 at 83–88), and to other customers (Doc. 158 at 111–12, 117; Doc. 159 at 224; Doc. 160 at 97). Nestor's customers consistently testified that Nestor distributed GBL from a gallon jug that he always kept in the living room.

Nestor argues (Doc. 1 at 25–26) that counsel could have further undermined Detta Spence's testimony by cross-examining the United States' expert witnesses about Kniep's time of death. In particular, Nestor claims that Spence could not have seen Paul Kniep alive when she returned from her thirty-minute trip to buy crack cocaine because, according to the United States' experts, Kniep died within thirty minutes of ingesting the GBL.

The scope of cross-examination is "well within the discretion of a defense attorney," *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985), and Nestor's counsel cross-examined the United States' expert witnesses at length. (Doc. 160 at 169–202; Doc. 155 at 35–45; Doc. 161 at 63–81, 154–190) Because the experts' testimony was generally consistent with Detta Spence's timeline,[5] counsel reasonably declined to pursue additional cross-examination.

**4. Failure to call Amanda Millner**

In ground seven, Nestor challenges counsel's failure to investigate and call as a witness Amanda Millner. According to the criminal complaint (Doc. 1 at ¶ 17), Millner saw Paul Kniep at Mon-Tee's Tavern and Eatery until about 1:00 a.m. on March 17, 2001. Because Detta Spence testified that Kniep arrived at her house around 3:00 a.m. or 3:30 a.m., Nestor argues that Millner's testimony would have

[5] The medical examiner opined that Paul Kniep died closer to 4:30 a.m. or 5:00 a.m., well after Detta Spence returned to the house. (Doc. 160 at 142–143) Laureen Marinetti opined that the death occurred "probably within an hour." (Doc. 161 at 62) Wayne Duer opined that Kniep died "shortly after" consuming GBL, but offered no more specific timeframe. (Doc. 160 at 167–168) Marc LeBeau testified that generally a person can lose consciousness about fifteen to thirty minutes after ingesting a high dose of GBL but clarified that a person could "go into a very severe central nervous system depressant mode and die as a result of that sometime later." (Doc. 161 at 96, 151)

established a two-hour window during which Paul Kniep could have acquired GBL from another source.

Nestor's claim is impermissibly speculative because he offers no affidavit from Millner. *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001); *accord United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit."). In any event, "[c]ounsel is not required to present every nonfrivolous defense." *Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 726 (11th Cir. 2012) (internal quotation marks omitted). Counsel's decision to omit the "two-hour window" theory and focus on the analogue defense is reasonable for the reasons discussed, particularly given the absence of evidence that Kniep consumed GBL distributed by a source other than Nestor.[6] *Dill v. Allen*, 488 F.3d 1344, 1357 (11th Cir. 2007) ("[C]onstitutionally sufficient assistance of counsel does not require presenting an alternative — not to mention unavailing or inconsistent — theory of the case.").

**5. Failure to impeach Detective Massucci**

As the United States' first witness, Detective Charles Massucci provided an overview of the case. (Doc. 158 at 31–90) In ground four, Nestor argues (Doc. 1

[6] Danny Golden testified that Kniep was not street smart and would not buy GBL off the street. (Doc. 159 at 85, 89–90) Also, the two-hour window theory is contradicted by Ken Osiel's timeline, which places Kniep at Nestor's house around 1:15 a.m. (Doc. 9-2 at ¶¶ 2–3)

at 27–30) that counsel failed to "adequately impeach" at least three of Massucci's statements.

First, Nestor maintains that Massucci falsely testified that he was present "at the scene" when Nestor was arrested. (Doc. 158 at 61–62) Nestor argues (Doc. 1 at 27) that another witness, Detective James Ford, "specifically stated that Detective Massucci was not present at the time of arrest." In fact, Detective Ford did not testify to Massucci's location or to Massucci's presence "at the scene":

> Q: What happened leading up to the search warrant?
>
> A. We had detained Russell Nestor —
>
> Q. Where did that occur?
>
> A. That occurred at Armenia and Hillsborough, at a Kash n' Karry liquor store.
>
> Q. And who was there to detain him?
>
> A. Detective Graham and I — I was there also.

(Doc. 159 at 107)

Second, Nestor argues that Massucci falsely testified he was present during the search, but Nestor again mischaracterizes Massucci's testimony. Massucci testified that he "maintained control and custody" of Nestor in a car while "the other three members of law enforcement executed the search warrant." (Doc. 158 at 63) And on cross-examination, Massucci volunteered that he "didn't conduct the actual search of the house." (Doc. 158 at 91)

Third, Nestor maintains that Massucci falsely testified that he talked to the Spences on March 18, 2001. (Doc. 158 at 68) With no citation to the record, Nestor alleges that police reports state that Massucci interviewed the Spences on March 17, 2001. However, Detta Spence testified that "[n]o one questioned us the day of Paul's death, that day." (Doc. 158 at 212)

Because Nestor identifies no significant inaccuracy in Massucci's testimony, counsel reasonably declined to pursue additional cross-examination. *See Johnson*, 256 F.3d at 1186 ("Claims that an attorney should have cross-examined further on inconsequential matters do not establish constitutionally deficient performance.")

**6. Failure to address the 911 evidence**

More than two hours before Patrick Spence reported Kniep's death, Nestor placed two 911 calls: a seven-second call at 4:59 a.m., during which only the dispatcher speaks, and an eleven-second call at 5:00 a.m., during which Nestor states that he dialed 911 accidentally. (Doc. 158 at 90, 134–137; Pre-Sentence Report at ¶ 27) In ground six, Nestor argues (Doc. 1 at 32–34) that counsel "failed to confront" the 911 calls by explaining that Nestor was attempting to reach his girlfriend.

In cross-examining the police communications technician, counsel immediately introduced the "accidental 911 call" theory:

> Q. Ms. Mellor, do you get many accidental calls to 911 through cell phones?
>
> A. Yes, sir.

> Q. How does that happen?
>
> A. Some phones are set up to dial 911 when a certain digit is pressed. Some phones are set up, not just cell phones, but regular phones, when a number is dialed and not hung up, it sends out a tone. And rather than have the tone just go nowhere, it rings into 911 in case the person had an emergency. We get a lot of dropped 911 calls.

(Doc. 158 at 142) Nestor fails to explain how counsel could have presented the minimally more descriptive explanation that Nestor was attempting to call his girlfriend, particularly given that Nestor declined to testify. (Doc. 162 at 72–74)

Within ground six, Nestor briefly complains that counsel failed to investigate and call as a witness his girlfriend. Counsel's duty to investigate "does not necessarily require counsel to investigate each and every evidentiary lead," *Williams*, 598 F.3d at 793, and Nestor's conclusory claim identifies no reason to investigate or call the girlfriend.

**7. Cumulative error**

In ground eight, Nestor argues that counsel's alleged deficiencies, along with unidentified "other" errors, collectively demonstrate ineffective assistance. Because Nestor shows no deficient performance, the cumulative error claim necessarily fails. *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1269 (11th Cir. 2012) ("[O]nly the effect of counsel's actions or inactions that do meet that deficiency requirement are considered").

## Conclusion

Nestor's motion to vacate (Doc. 1) is **DENIED**. The clerk must enter a judgment against Nestor and **CLOSE** this case.

## DENIAL OF BOTH CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

To merit a certificate of appealability, Nestor must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. 28 U.S.C. § 2253(c)(2); *Lambrix v. Sec'y, Fla. Dep't of Corrs.*, 851 F.3d 1158, 1169 (11th Cir. 2017). Because Nestor fails to show that reasonable jurists would debate the merits of the procedural issues or the merits of the claims, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Nestor must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on June 28, 2018.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE